**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| INTERNATIONAL ACADEMIC CITY, ) <br> and SAQI BARZANI, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> STRATFORD UNIVERSITY, INC. ) <br> and RICHARD SHURTZ, ) <br> ) <br> Defendants. ) | Civil Action No. 1:20-cv-193 |

**MEMORANDUM IN SUPPORT OF THE MOTION TO DISMISS**

Defendants Stratford University, Inc. ("Stratford" or the "University") and Richard Shurtz (collectively, "Defendants"), by counsel, pursuant to Local Civil Rule 7(F), submit this Memorandum in Support of the Motion to Dismiss to respectfully request an Order dismissing Counts II, III, IV, and V of the Amended Complaint filed by plaintiffs International Academic City ("IAC") and Saqi Barzani (collectively, "Plaintiffs").

**INTRODUCTION**

This action arises from a failed affiliation between Stratford and IAC, who were exploring the viability and taking preliminary steps to open a branch campus in Erbil, Kurdistan. The parties had not yet created a joint venture entity or sought approval for a branch campus from the Accrediting Council for Independent Colleges & Schools ("ACICS"). However, Stratford did share proprietary educational material, access to learning software, and provide logistics for the first step in the affiliation, which was an offering of language courses and non-collegiate foundation courses through Stratford University Language Institute, LLC ("SLI"). These preparatory courses would provide the Kurdish students with the necessary language skills

1

to pursue future enrollment with Stratford in the United States, online, or optimistically, in a future accredited branch campus located in Erbil.

Unfortunately, without Stratford's authorization, IAC advertised to and enrolled degree-seeking students and used the educational material provided for SLI's foundation courses to operate the unauthorized branch campus. When Stratford and ACICS learned of these actions, the Kurdish students were notified that the collegiate-level coursework offered by IAC was unauthorized and unaccredited. In response, Plaintiffs formally terminated any remaining affiliation between the parties and initiated this action, which pursues claims of defamation, fraudulent concealment and misrepresentation, tortious interference with IAC's students, and breach of contract.

Plaintiffs allegations far exceed the bounds of acceptable alternative pleading. Instead, the Amended Complaint pursues contract and fraud claims based on an alleged fully operational joint venture, which entailed mutual ownership and control, while simultaneously pursuing defamation and tortious interference claims premised on sole ownership over the venture and an independent contractual relationship with the students. By alleging incongruous facts that are bolstered by self-contradicting exhibits, Plaintiffs have failed to articulate a plausible claim for relief. Accordingly, and for additional grounds for dismissal identified below, Defendants respectfully request that Counts II, III, IV, and V of the Amended Complaint be dismissed.[1]

**FACTUAL ALLEGATIONS IN THE AMENDED COMPLAINT**

Defendants deny the accuracy of the allegations and the authenticity of certain exhibits, but for the purpose of this Motion to Dismiss, Defendants must recite the allegations as alleged

---

[1] For clarity, Stratford denies making defamatory statements relating to its affiliation with IAC and intends to vigorously defend those claims, but it is not moving to dismiss Count I at the pleading stage.

in the Amended Complaint. *See Kensington Volunteer Fire Dep't v. Montgomery County*, 684 F.3d 462, 467 (4th Cir. 2012).

In April 2018, the Accrediting Council for Independent Colleges and Schools ("ACICS") issued an institutional show-cause directive to Stratford University. *See Am. Compl*. ¶ 6, Ex. 1A (ACICS Counsel Actions at 2). Pursuant to the accreditation criteria published by ACICS, an "institution under a show-cause directive or a negative action will not receive approval from ACICS for the initiation of any branch campus while the action is in effect." *See id.* ¶ 7, Ex. 2 (Accreditation Criteria § 1-2-104(a)).

In May 2018, Shurtz (on behalf of Stratford) restarted earlier negotiations with Barzani (on behalf of IAC) "to open a branch-campus in Erbil, Iraq." *See Compl*. ¶ 8. On or about July 27, 2018, IAC and Stratford signed a document (the "Preliminary Agreement") that memorialized the parties' willingness to form a joint venture entity and open a branch campus in the future. *Id.* ¶ 11; Ex. 3A (Preliminary Agreement). According to this version of the document, the "branch campus" would be "a division of and owned by IAC." *Id.* Around the same time, Shurtz visited Kurdistan and allegedly publicized, "that the Erbil campus was fully accredited through Stratford." *Id.* ¶ 12.

Soon thereafter, IAC claims to have submitted a "full branch-campus proposal" and "catalogs of the officially requested majors and programs" to the Kurdistan Ministry of Higher Education and Scientific Research in order to obtain a "full and unrestricted license for a branch campus." *Id.* ¶ 13, Exs. 5A, 5B. On August 6, 2018, the Kurdish government granted a license to Stratford—not to IAC or Barzani—to open a branch campus in Erbil. *Id.*, Ex. 6.

3

In October and November 2018, Stratford assisted IAC with offering certain coursework through Stratford Language Institute,[2] which was expanded in later semesters. *Id.* ¶ 14. In total, students took ten foundation courses in 2018 and 2019 in various standard disciplines. *Id.* Through the first semester of the 2019-2020 school year, Plaintiffs claim that the Erbil campus was "fully operational and IAC and its principals continued to believe it was fully accredited branch campus, due to Dr. Shurtz's false representations." *Id.* ¶ 15.

In March 2019, the parties signed a "Revised Agreement," which again states that that IAC and Stratford "will form a joint venture," but changes Stratford's income from fifteen (15) percent of net revenue to seven (7) percent of gross revenue.

On or about September 19, 2019, ACICS began investigating the branch campus in Erbil, and Stratford represented to ACICS that the campus was only associated with SLI, and that it would initially be accredited through SLI's separate accrediting body. *Id.* ¶ 18. Stratford further told ACICS that SLI's affiliation "would ensure a pool of qualified candidates when the Stratford campus was operational. Students who completed the two-year SLI program would be accepted into Stratford University…either in the US, online, or Erbil, if approved by ACICS." *Id.* ¶ 18, Ex. 15.

IAC denies ever having any affiliation with SLI, and instead avers that the "joint venture agreements have always been with Stratford University to establish a branch campus." *Id.* ¶¶ 17, 20. "The courses offered by Stratford University in Erbil included ESL, and many additional credit courses…designed as part of the students' supposedly accredited majors and programs at the bachelor['s] degree level." *Id.* ¶ 20.

---

[2] SLI is a legally distinct but affiliated entity that primarily offers English as a second language ("ESL") courses, as well as other foundation (or non-collegiate) courses that assist in the development of language skills and provide secondary-level educational standards that are necessary prior to enrollment at the University.

4

On or about October 31, 2019, the parties executed a Memorandum of Understanding (the "MOU"), and the version attached to the Complaint states in relevant part:

1. IAC and STRATFORD shall subscribe to the capital of a new company to be incorporated as a private limited company which shall be their joint venture vehicle ('Company') in the proportion of 50:50. The shareholding in the company of IAC and STRATFORD shall always remain in this proportion....

\*\*\*

4. The Parties herein wish to offer higher educational programs of Stratford University to students in Erbil and other parts of Kurdistan, Iraq through a company to be established for this purpose.

\*\*\*

10. All Stratford offerings in Erbil shall be done exclusively through the company. Stratford can however recruit students from Erbil, Iraq for their locations outside Kurdistan. STRATFORD can also offer Stratford on-line programs hosted outside of Erbil to Iraqi/Kurdish students.

\*\*\*

15. The definitive agreements to elaborate the terms of this MOU shall be executed by the parties by June 30, 2018 so that the JV can be incorporated as IAC – STRATFORD Pvt. Ltd. (TBD) without delay.

*Id.* ¶ 22; Ex. 11 (MOU ¶¶ 1, 4, 10, 15). IAC claims to have "felt compelled" to enter into the MOU because it was "needed to support the accreditation of the branch campus and to extricate Stratford and IAC from ACICS's investigation." *Am. Compl.* ¶ 23.

On December 19, 2019, ACICS issued a show-cause directive to Stratford addressing the unauthorized Erbil campus. *Id.* ¶ 25. When Stratford responded that the Erbil campus was affiliated with SLI and that it was not authorized to offer degree programs, IAC sent a letter to both Stratford and ACICS, stating:

> Pursuant to the parties' agreement and acknowledgments, the Erbil campus is a division of IAC, and thus is wholly owned by IAC. Stratford University retains the rights to certain payments and academic input under the agreement, but it does not possess the authority to dictate withdrawal of IAC's students, who have separately contracted with IAC independent of Stratford University or ACICS...
>
> \*\*\*
>
> IAC and the American Stratford University at Erbil immediately and forthwith disassociates itself from Stratford University. In the spirit of mutual cooperation, IAC requests 40 days from today's date to transition the Erbil campus away from Stratford University.

5

*Id.* ¶¶ 25–26, Ex. 17.

On January 6, 2020, in response to ACICS direction, Dr. Shurtz sent an email to all of the Erbil campus students, which asserted among other things: (a) that its limited partnership only "authorized the operation of Stratford Language Institute in Erbil;" (b) that the parties were planning to eventually "establish a fully-accredited campus;" (c) that IAC "never established the proper Joint Venture Corporate structure;" and (d) that "IAC formally disaffiliated with Stratford University via letter." *Id.* ¶ 28. At or around the same time, Stratford posted a statement on its website, which includes similar statements to its email, but also stated: (e) that IAC "enrolled students in fake Bachelor and Masters Degrees;" (f) that "the operation in Kurdistan [was] rogue and unauthorized; and (g) that Stratford would work with affected students to transfer to Stratford in the US or enroll in Stratford online courses. *Id.* ¶ 30.

## **LEGAL STANDARD**

In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court tightened the federal system's notice pleading standard, holding that Federal Rule of Civil Procedure 8(a) requires sufficient factual information to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Accordingly, a plaintiff has an obligation to provide more than mere "labels and conclusions," or a "formulaic recitation of the elements of a cause of action." *Id.* at 545. To nudge the claims "across the line from conceivable to plausible," the complaint must contain "sufficient factual matter, accepted as true," to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Nemer Chevrolet, Ltd. v. Consumeraffairs.com Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 683 (2009)). To allow for such an inference, the plaintiff must "allege facts in

6

support of each element of each claim he or she raises." *See Anderson v. Bolster*, E.D. Va. No. 1:19-cv-75, 2020 WL 1056504, at *3 (E.D. Va. Mar. 4, 2020) (citing *Iqbal*, 556 U.S. at 678).

To properly plead claims of fraud or fraud in the inducement, Federal Rule of Civil Procedure 9(b) requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783–84 (4th Cir. 1999). A failure to comply with the heightened standard in Rule 9(b) is treated as a failure to state a claim under Rule 12(b)(6). *See Metro Mail Services, Inc. v. Pitney Bowes, Inc.*, Case No. 1:16-cv-1416, 2017 WL 1230848, at *3 (E.D. Va. Mar. 31, 2017) (citing *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 432 (4th Cir. 2015)).

When determining the plausibility of allegations, the Court should apply its own "judicial experience and common sense," *see Iqbal*, 556 U.S. at 679, and it may also consider whether assertions of fact are contradicted by the evidence available. *See Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 937-38 (E.D. Va. 2010) ("bare assertions" that are "flatly contradicted by…[exhibits] are plainly insufficient…to state a plausible claim for relief").

## ARGUMENT

Even accepting the factual allegations as true, fundamental inconsistencies emerge during a careful examination of the Amended Complaint and its exhibits. On the one hand, in the fraud and contract counts, Plaintiffs claim to have been induced to form a joint venture, wherein they believed the parties were operating a fully accredited branch of Stratford University in Erbil, Kurdistan. However, the purported agreements attached to the Amended Complaint manifest the parties' clear intent that the planned venture required the creation of a new entity, owned in part by Stratford, as required by the Kurdish license (Ex. 6) and ACICS standards (Ex. 2). At the same time, in the tortious interference and defamation counts, Plaintiffs disavow the existence of

7

a jointly operated venture, instead claiming that IAC—an unlicensed "investment company"—is the sole proprietor and owner of an institution of higher learning that "separately contracted" with its students.

Rather than stating alternate causes of action, Plaintiffs have alleged alternate realities, supported by implausible and contradictory facts, some of which are belied by their own exhibits. Addressing the claims in a different order than their presentation in the Amended Complaint, Defendants will show that the parties' preliminary agreements could not form the basis of a valid joint venture, and that Plaintiffs cannot state viable claims for fraud or tortious interference. For these reasons, Defendants respectfully request the Court enter an Order dismissing Counts II, III, IV, and V of the Amended Complaint.

I. **Plaintiffs Fail to Plausibly Allege the Creation of a Joint Venture.**

In stating its claim for breach of contract and by pursuing fraud in the inducement, Plaintiffs explicitly rely on the creation of a joint venture, wherein the parties allegedly joined together to operate a branch campus of Stratford University in Erbil, Kurdistan. *See Am. Compl.* ¶¶ 43, 47, 50. To establish breach of contract, the plaintiff must first establish the existence of a valid contract. *See Kancor Americas, Inc. v. ATC Ingredients, Inc.*, Case No. 1:15-cv-00589, 2016 WL 740061, at *7 (E.D. Va. Feb. 25, 2016) (citing *Sykes v. Brady-Bushey Ford, Inc.*, 69 Va. Cir. 219, 219 (2005)).

According to Plaintiffs, the joint venture was formed by express agreement. *See Am. Compl.* ¶¶ 11, 50. However, the various agreements presented to the Court are unenforceable because: (a) they require the happening of an unfulfilled condition precedent; (b) they constitute preliminary agreements to agree; and (c) the surrounding circumstances display a complete lack of mutual intent to be immediately bound. Finally, even if the agreements were immediately

binding, a joint venture was never formed because the agreements and Plaintiffs' statements deny that the parties shared ownership and control.

### A. The Alleged Agreements are Unenforceable Because the Parties' Obligations Were Dependent on the Future Formation of a Jointly Held Entity.

The Preliminary Agreement, Revised Agreement, and MOU are unenforceable because a condition precedent to performance remains unfulfilled, *i.e.*, the creation of a new, jointly owned entity. Under Virginia law,[3] a "condition precedent calls for the performance of some act, or the happening of some event after the terms of the contract have been agreed upon, before the contract shall take effect." *See Smith v. McGregor*, 237 Va. 66, 376 S.E.2d 60, 65 (1989). Additionally, a condition precedent exists where "the contract is made in form, but does not become operative as a contract until some future specified act is performed, or some subsequent event occurs." *Morotock Ins. Co. v. Fostoria Novelty Co.*, 94 Va. 361, 26 S.E. 850, 852 (1897).

Here, the language of the purported agreements clearly articulates the parties' intent to form a future entity that would be owned by both parties, not solely by IAC. Both the Preliminary Agreement and Revised Agreement state that IAC and Stratford "***will form*** a joint venture for the delivery of quality education in Kurdistan." *See* Ex. 3A, *Preliminary Agreement*; Ex. 3B, *Revised Agreement* (emphasis added). The Preliminary Agreement and Revised Agreement also discuss the makeup of the new entity's board of trustees, standards for contribution and capital calls from Stratford and IAC, and the division and reimbursement of expenses. *Id.* The fully endorsed MOU is even more explicit:

---

[3] The parties' agreements do not state a preference for either U.S. or Kurdish law, so the Court should apply Virginia's choice-of-law rules for this diversity action. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The applicable choice-of-law provision requires application of Virginia law because Plaintiffs delivered the contracts to Defendants here in Virginia. *See Am. Compl.* ¶ 22, Exs. 12A, 12B, 12C (Emails Delivering the Contracts); *see also Capers v. White*, 195 Va. 1123, 81 S.E.2d 597, 600 (1954).

9

1. IAC and STRATFORD *shall subscribe to the capital of a new company* to be incorporated as a private limited company which shall be their joint venture vehicle ('Company') in the proportion of 50:50. The shareholding in the company of IAC and STRATFORD shall always remain in this proportion….

   \*\*\*

4. The Parties herein wish to offer higher educational programs of Stratford University to students in Erbil and other parts of Kurdistan, Iraq *through a company to be established* for this purpose.

   \*\*\*

10. All Stratford offerings in Erbil *shall be done exclusively through the company*. Stratford can however recruit students from Erbil, Iraq for their locations outside Kurdistan. STRATFORD can also offer Stratford on-line programs hosted outside of Erbil to Iraqi/Kurdish students.

*See* Ex. 11, *MOU* ¶¶ 1, 4, 10 (emphasis added). In Virginia, a contract is to be interpreted as a whole in order to ensure that each clause is given purpose and effect. *See Winn v. Aleda Constr. Co.*, 227 Va. 304, 307 (1984). None of these additional provisions make sense if the parties intended to immediately form and operate a joint venture that was wholly owned and operated by IAC alone, as alleged by Plaintiffs. *See Am. Compl.* ¶ 11.

In *Space Tech. Dev. Corp. v. Boeing Co.*, 209 Fed. Appx. 236, 2006 WL 3612816 (4th Cir. 2006) (unpublished), the Fourth Circuit affirmed a trial court's decision to grant a motion to dismiss, which challenged the enforceability of a joint venture. *Id.* at \*1. In that case, the parties executed a letter of intent that expressly contained a series of "binding provisions," but the plain text of the letter of intent also "required that there be an LLC in existence in order to trigger" Boeing's obligations. *Id.* at \*3. Because the complaint did not allege that any such entity had been formed, Boeing was not required to perform duties on behalf of the venture. *Id.* at \*4. Similarly, in *Standefer v. Thompson*, 939 F.2d 161 (4th Cir. 1991), the Fourth Circuit found no enforceable obligations under a preliminary agreement that contemplated that a corporation would be formed to carry out the duties of the joint venture. *Id.* at 164.

Because Plaintiffs have not alleged (and cannot allege) that any jointly held entity was formed, a necessary condition precedent did not occur, and Defendants cannot be held liable for the alleged failure to perform. *See, e.g., Forrest Creek Assocs. Ltd. v. McLean Sav. & Loan Ass'n*, 831 F.2d 1238, 1241 (4th Cir. 1987).

### B. The Agreements are Unenforceable Agreements to Agree.

The agreements that allegedly formed the parties' joint venture are also unenforceable agreements to agree. To form a binding contractual obligation, there must be "mutual assent of the contracting parties to terms reasonably certain under the circumstances." *See W.J. Schafer Assoc., Inc. v. Cordant, Inc.*, 254 Va. 514, 519, 493 S.E.2d 512 (1997). Mere "agreements to agree in the future" are "too vague and too indefinite to be enforced." *Id.* Likewise, when "a letter of intent or any other writing in which the terms of a future transaction" or more formal agreement are clearly implicated, then it "is presumed to be an agreement to agree rather than a binding contract." *Va. Power Energy Mktg., Inc. v. EQT Energy, LLC*, Case No. 3:11-cv-630, 2012 WL 2905110, at *4 (E.D. Va. July 16, 2012).

Here, the agreements presented in the Amended Complaint do not reflect an unambiguous and immediate intent to bound. Rather, the Preliminary Agreement was intended to be nothing more than its title, a *preliminary agreement* to form a future joint venture. See Ex. 3A. Indeed, if the Preliminary Agreement authorized an immediate initiation of collegiate coursework, as alleged by Plaintiffs, then it makes no sense that the Revised Agreement—signed several semesters later—would again be drafted in future tense. *Compare Am. Compl.* ¶¶ 12, 14, *with* Ex. 3B (the parties "***will form*** a joint venture for the delivery of quality education in Kurdistan") (emphasis added). If questions remain, the text of the MOU removes any doubt of the parties' intent to formally endorse a future agreement: "definitive agreements to elaborate the terms of this MOU ***shall be executed*** by the parties…." See Ex. 11, (MOU ¶ 15).

Even if the parties were in full agreement on each term of their planned joint venture, evidence that a future agreement was contemplated "is strong evidence to show that they did not intend the previous negotiations to amount to an agreement which is binding." *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 939 F.Supp.2d 572, 580 (E.D. Va. 2013), *aff'd*, 549 Fed. App'x. 211 (4th Cir. 2014). And, where the parties expressly agree to endorse a future agreement—like in the MOU—a failure to execute formal documents constitutes another failed condition precedent that precludes liability under the agreement. *See Meridian Investments, Inc. v. Fed. Home Loan Mortgage Corp.*, Case No. 1:15-cv-1463, 2016 WL 795454, at *5 (E.D. Va. Mar. 1, 2016), *aff'd*, 855 F.3d 573 (4th Cir. 2017).

### C. The Parties' Actions, Plaintiffs' Statements, and the Other Exhibits do not Support the Creation of a Joint Venture.

When deciding if an agreement constitutes an enforceable contract, courts must also consider whether the surrounding circumstances evince the parties' intent to enter into a binding contract. *See High Knob, Inc. v. Allen*, 205 Va. 503, 508, 138 S.E.2d 49, 53 (1964).

According to the Amended Complaint, the parties formed a joint venture that was wholly owned by IAC, applied and obtained a license from the Kurdish government, and, relying on Stratford's ACICS accreditation, operated a fully accredited branch campus of Stratford University in Erbil, Kurdistan. *See Am. Compl.* ¶¶ 11–14. However, internal inconsistencies and an examination of the other exhibits bely the existence of mutual intent to form that partnership.

The most glaring inconsistency concerns IAC's repeated insistence that the parties formed a joint venture, but the Erbil campus was wholly owned by IAC. *Id.* ¶ 11. This could never occur. The application submitted to the Kurdish government makes absolutely no mention of IAC or Barzani. *Id.* ¶ 13, Exs. 5A, 5B. And, the corresponding license was granted to Stratford University. *See* Ex. 6 (Kurdish License). Attempting to bolster allegations of fraud,

Plaintiffs attached certain accreditation criteria to the Amended Complaint, but failed to examine the other criteria on the same page:

> A branch campus is a location of an institution that is geographically apart and independent of the main campus of that institution, ***but under the same corporate structure as the main campus*** (i.e., part of the main campus corporation or a wholly owned subsidiary).

*Id.* ¶ 7, Ex. 2 (Accreditation Criteria § 1-3-102) (emphasis added). Under these standards and common sense, IAC, which the MOU describes as an "investment company," could not solely own and operate an accredited branch of Stratford University. This reality coupled with the contradictions of fact identified above undercut any plausible inference that the parties meant to form an immediate joint venture. *See Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 937-38 (E.D. Va. 2010) ("bare assertions" that are "flatly contradicted by…[exhibits] are plainly insufficient…to state a plausible claim for relief").

### D. Plaintiffs' Claim of Ownership Destroys the Possibility of a Joint Venture.

For all the reasons stated in the prior three subsections, the agreements attached to the Amended Complaint cannot be considered enforceable contracts. However, even if they were binding, Plaintiffs' insistence that the branch campus was wholly owned by IAC forecloses the possibility of a viable joint venture.

In Virginia, a "joint venture is established by contract, express or implied, where two or more persons jointly undertake a specific business enterprise for profit, with [1] each to share in the profits or losses and [2] each to have a voice in the control and management." *See Kancor Americas, Inc. v. ATC Ingredients, Inc.*, Case No. 1:15-cv-589, 2016 WL 740061, at *11 (E.D. Va. Feb. 25, 2016) (quoting *Ortiz v. Barrett*, 278 S.E.2d 833, 840 (1981)). Applying those elements, the Fourth Circuit refuses to recognize a joint venture, "unless the parties each 'have a voice in the control and management' of the enterprise." *See Flip Mortg. Corp. v. 9 McElhone*,

841 F.2d 531, 539 (4th Cir. 1988) (quoting *Ortiz*, 278 S.E.2d at 840). This requires an "equal right to direct and govern the movements and conduct of each other in respect thereto." *Id.* (quoting *Alban Tractor Co. v. Sheffield*, 220 Va. 861, 863, 263 S.E.2d 67, 68 (1980)).

As noted above, Plaintiffs allege that the Preliminary Agreement and Revised Agreement vested them with sole ownership over the joint venture. *See Am. Compl.* ¶ 11. Indeed, on December 27, 2019, Plaintiffs, through counsel, declared:

> Pursuant to the parties' agreement and acknowledgment, the Erbil campus is a division of IAC, and thus is ***wholly owned by IAC***. Stratford retains the rights to certain payments and academic input under the agreement, but it does not possess the authority to dictate withdrawal of ***IAC's students, who have separately contracted with IAC independent of Stratford University or ACICS***.

*See* Ex. 17 (Letter from Stine) (emphasis added). If the campus was wholly owned by IAC, and the students had no contractual affiliation with Stratford, it cannot plausibly be inferred that Stratford possessed an "equal right to direct and govern." *See Flip Mortg. Corp.*, 841 F.2d at 539 (affirming dismissal at the pleading stage). Because the parties never entered into an enforceable contract and because Plaintiffs' allege absolute control and ownership over the Erbil campus, the Amended Complaint fails to properly allege the existence of a joint venture or state a claim for breach of contract. Thus, the Court should dismiss Count V of the Amended Complaint.

## II. Without an Enforceable Contract, Plaintiffs Could not have been Fraudulently Induced to Form a Joint Venture. Alternatively, the Claims are Barred by the Economic Loss Rule.

Counts II and III of the Amended Complaint assert duplicative claims for fraud in the inducement. However, because the parties did not intend to immediately form a joint venture and only had an unenforceable "agreement to agree," Plaintiffs could not have been legally induced to enter into a contract.

14

Under Virginia law, a claim of fraud requires a showing of (1) a false representation, (2) of a material fact, (3) that was made intentionally and knowingly, (4) with the intent to mislead, (5) reasonable reliance by the party misled, and (6) resulting damage to the party misled. *Cohn v. Knowledge Connections, Inc.*, 266 Va. 362, 367, 585 S.E.2d 578, 581 (2003). Virginia law also recognizes fraud by concealment, but "where there is no duty to disclose, silence does not constitute concealment." *White v. Potocska*, 589 F. Supp. 2d 631, 642 (E.D. Va. 2008). Finally, claims of fraud must satisfy a heightened pleading standard, which requires Plaintiffs "state with particularity the circumstances constituting fraud." *See* Fed. R. Civ. P. 9(b).

Here, Plaintiffs claims to have been misled during negotiations leading up to the formation of a joint venture in 2018. Specifically, Defendants (i) misled IAC "that [Stratford] was fully accredited with ACICS and that such accreditation would cover Stratford's branch campus in Erbil;" and (ii) concealed the fact Stratford was under an April 2018 show-cause directive "that prohibited Stratford from obtaining approval for accreditation of a branch campus." *Id.* ¶¶ 8–10. However, as noted in the preceding section, there was no mutual intent to immediately form a joint venture, and instead, only created an unenforceable "agreement to agree." Logically, plaintiff could not have been induced to enter into a joint venture that never existed. Plaintiff cannot establish a cause of action for fraudulent inducement and seek damages flowing from a purported agreement where no such agreement exists. *See CGI Fed. Inc. v. FCi Fed., Inc.*, 295 Va. 506, 518, 814 S.E.2d 183, 190 (2018) ("[W]e conclude lost profits are not recoverable for a fraudulent inducement claim when they are based on the provisions of an unenforceable contract.").[4]

---

[4] The vast majority of Plaintiffs' claimed damages are in the form of lost profits. *See Am. Compl.* at 28–29 (Ad Damnum).

Alternatively, if the parties did enter into an enforceable joint venture, then Plaintiffs' fraud claims are barred by the economic loss rule. Misrepresentations relating to a contract duty cannot support an action for fraud based on the economic loss rule. *See Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 507 S.E.2d 344, 347 (1998). The alleged misrepresentations and concealments in the Amended Complaint concern Stratford's alleged promise under the preliminary agreements to obtain and supply valid accreditation to the branch campus in Kurdistan, and therefore, any misrepresentations related to such duty arise under the parties' various agreements. To the extent Stratford failed to live up to its promise to obtain accreditation for the contemplated branch campus, such failure would constitute a breach of contract, not fraud.[5]

Plaintiffs' fraud claims fail for yet another reason. Plaintiffs have not alleged that Stratford made any positive or affirmative statement or misrepresentation regarding the show-cause directive issued by ACICS. Rather, Plaintiffs' fraud claims are founded upon Stratford's alleged *concealment* of the fact that the accrediting agency had issued the directive. Unlike fraud claims premised upon affirmative statements of fact, claims based on concealment of material facts are only actionable under Virginia law if there existed some duty on the part of the defendant to disclose the facts to the plaintiff. *Frank Brunckhorst Co., L.L.C. v. Coastal Atl., Inc.*, 542 F. Supp. 2d 452, 461 (E.D. Va. 2008). Any duty to disclose that is the basis of a fraud claim "must be a duty arising under common law, not the contract itself." *White v. Potocska*, 589 F. Supp. 2d 631, 644 (E.D. Va. 2008). Here, Plaintiffs have not identified any common law obligation by which Stratford was required to disclose the existence of the show cause from its

---

[5] Further, the claims do not fall within the limited exception for fraudulent inducement because all ACICS information is publicly available online, and Plaintiffs further acknowledge receiving notice of issues with accreditation before endorsing the MOU. *See Am. Compl.* ¶¶ 8, 21–22.

16

accreditor. Because it had no duty to disclose those facts to Plaintiffs while the parties negotiated a joint venture, Stratford cannot be liable for fraudulent concealment of those facts.

Finally, it is worth noting that the show cause was publicly available online. *See Am. Compl.* ¶ 8, n.1. Indeed, the purpose of accreditation is to inform the public regarding the viability of an educational institution. Plaintiffs could have accessed such information on their own. This further undercuts Plaintiffs' claim of fraud based upon concealment. Stratford could not conceal information that was publicly available and easily accessible to anyone with an internet connection.

For all these reasons, the Court should dismiss Counts II and III of the Amended Complaint.

## III. Plaintiffs Fail to State a Claim for Tortious Interference.

Count IV of the Amended Complaint alleges tortious interference with contract. To properly assert a claim for tortious interference, Plaintiffs must allege (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Chaves v. Johnson*, 230 Va. 112, 120 (1980). Plaintiffs' claim of tortious interference fails for at least three reasons.

First, the contractual relationship identified in the Amended Complaint concerns students and future tuition payments. *Am. Comp.* ¶ 48. To properly allege tortious interference, the plaintiff must identify a particular expectancy, and it must be reasonably certain that absent the defendant's misconduct, the plaintiff would have realized the expectancy. *See N.Y. Carpet World, Inc. v. Grant*, 912 F.2d 463, 1990 WL 123871, at *2 (4th Cir. 1990). However, an

17

institution's relationship with its students is terminable at will, and the expectancy of "remaining in business" or analogously, remaining enrolled, is too general to support a tortious interference claim. *Cox v. MAG Mut. Ins. Co.*, Case No. 3:14-cv-377, 2015 WL 1640513, at *5 (E.D. Va. Apr. 9, 2015) (citing *Masco Contractor Services East, Inc. v. Beals*, 279 F.Supp.2d 699, 710 (E.D. Va. 2003)).

Second, because Plaintiffs' allege that the parties formed a joint venture and further allege that the campus was licensed and accredited under Stratford, Plaintiffs cannot credibly claim that the students "separately contracted with IAC independent of Stratford." *Compare* <u>Ex. 6</u> (Kurdish License), *with* <u>Ex. 17</u> (Letter from Stine). If, as alleged, Stratford was involved in the opening and operation of a branch campus in Erbil, then Stratford cannot be liable because a party cannot interfere with its own contracts. *See MAG Mut. Ins. Co.,* 2015 WL 1640513, at *4. Rather, a tortious interference claim requires the existence of three actors—the two parties to the contract and a third-party who interferes with, or induces one of the parties to breach the contract. *See Storey v. Patient First Corp.*, 207 F. Supp. 2d 431, 448 (E.D. Va. 2002) (noting "it is axiomatic that a party cannot interfere with his own contract").

The second deficiency dovetails into the third. Plaintiffs claim to have both formed a joint venture, which requires mutual ownership and control, while simultaneously claiming sole ownership over the venture and an independent contractual relationship with the students. *Compare* <u>Ex. 3A</u> (Preliminary Agreement), *with* <u>Ex. 17</u> (Letter from Stine). Both cannot be true. The Plaintiffs have played fast and loose with their allegations in a "transparent attempt to conform the facts to the requirements of [each] cause of action." *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 127 (4th Cir. 2013) (Wilkinson, J., dissenting) (*quoting Bradley v. Chiron Corp.*, 136 F.3d 1317, 1324-26 (Fed. Cir. 1998)). Even if Rule 8 permits inconsistent claims, the

Amended Complaint should not treat "reality as a plastic entity to be molded" into compliance with the legal elements for varying causes of action. *Scott*, 733 F.3d at 127.

For all these reasons, the Amended Complaint contains "incongruous facts" and "contradictory factual allegations," and the Court should not "find a claim with 'facial plausibility' under the standards" required by *Twombly* and *Iqbal*. *See Saravia v. Select Portfolio Servicing, Inc.,* Case No. 1:13-cv-01921, 2014 U.S. Dist. LEXIS 84783, at *21-22 (D. Md. June 23, 2014) (*citing Stone v. Warfield*, 184 F.R.D. 553, 555 (D. Md. 1999)).

## CONCLUSION

WHEREFORE, Defendants respectfully request that this Court grant their motion and dismiss Counts II, III, IV, and V of the Amended Complaint with prejudice.

Respectfully submitted this 24th day of April 2020.

**STRATFORD UNIVERSITY, INC. and RICHARD SHURTZ**

By: /s/ Harold E. Johnson
Harold E. Johnson (VSB No. 65591)
Justin S. Feinman (VSB No. 87511)
WILLIAMS MULLEN, P.C.
200 South 10th Street, 16th Floor
Richmond, Virginia 23219
(804) 420-6000
(804) 420-6507 (facsimile)
hjohnson@williamsmullen.com
jfeinman@williamsmullen.com
*Counsel for Defendants*

CERTIFICATE OF SERVICE

On April 24, 2020, I certify that a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing as follows:

Stephen J. Stine, Esq. (VSB No. 66738)
The Stine Law Firm PLLC
3900 Jermantown Road, Suite 300
Fairfax, Virginia 22030
(703) 201-5075
(703) 647-6009 (facsimile)
stine@stinelaw.com
*Counsel for Plaintiffs*

By: /s/ Harold E. Johnson
Harold E. Johnson (VSB No. 65591)
WILLIAMS MULLEN, P.C.